## EDWARD SYKES
### vs.
## M. MARTIN DOLPHIN

Superior Court      Fairfield County      File #45219

Present: Hon. FRANK P. McEVOY, Judge.

Keogh & Candee,      Attorneys for the Plaintiff.

Cummings & Lockwood,      Attorneys for the Defendant.

### MEMORANDUM FILED MARCH 17, 1936.

McEVOY, J. The plaintiff, a resident of New York, is a retired business man who, formerly, was actively interested, voluntarily, in New York Police Relief Fund matters.

The defendant is an attorney at law who resides in Westport, Connecticut, and practices law in the City of New York.

The defendant was formerly an assistant corporation coun-

sel in the City of New York, from which position he resigned in 1927.

While the defendant occupied that position he met the plaintiff in connection with the plaintiff's voluntary interest in the welfare of policemen and Police Relief Fund Associations.

In May, 1930, the defendant had little practice.

At that time the plaintiff spoke with the defendant, and in that conversation and in subsequent conversations, the defendant became familiar with a great many details of the plaintiff's public and private affairs.

Prior to October 1, 1930, the lease of the apartment in which the defendant and his family resided expired and the defendant agreed to purchase from the plaintiff a house and lot in Westport, Connecticut, for the sum of $20,000.00.

In payment of the purchase price the defendant paid to the plaintiff $1500.00 in cash and the plaintiff accepted a mortgage for $1,000.00 on premises owned by the sister of the defendant.

In addition to this the defendant executed to the plaintiff a mortgage upon the Westport property in the sum of $17,500.00.

The defendant and his family moved into the Westport house on October 1, 1930, and the defendant became the owner of the Westport property and the title was vested in him on November 1, 1930.

The defendant and his family lived in the property at Westport for one month before the defendant became the owner of it.

During that time the defendant commuted daily between Westport and New York City and had every opportunity to acquaint himself with the value of and to determine the original cost of the premises.

By the terms of the mortgage note the defendant agreed to pay the $17,500.00 mortgage as follows: $500.00 on January 1, 1931, and $500.00 each three months thereafter with interest on unpaid balances to October 1, 1936, when the balance then remaining unpaid would become due and payable.

The defendant made the payments as agreed up to October 1, 1933.

Thereafter the defendant paid no interest.

Since that time the defendant has paid nothing.

The amount due to the plaintiff from the defendant on the mortgage note on December 31, 1935, was $15,005.20.

The parties are in conflict as to this amount but it is found in accordance with the claim of the defendant.

On the 16th day of August, 1934, foreclosure proceedings were instituted for the collection of the amount alleged to be due on the mortgage note.

The defendant has pleaded several defenses to the plaintiff's claim.

In the second defense it is alleged that the plaintiff misrepresented to the defendant the value of the premises conveyed to the defendant and it is also alleged that the plaintiff agreed with the defendant that the latter might at any time within three years after November 1, 1930, return the premises to the plaintiff and that the plaintiff would return to the defendant all sums expended by the defendant in connection with the purchase or improvement of the said premises by the defendant.

It is further alleged that the plaintiff "orally" agreed with the defendant to cancel all interest payments accruing after October 1, 1930 "and in consideration of said oral agreement the defendant retained said premises in his own name."

Upon all of the evidence this defense is not sustained.

In Paragraph 3 of the Third Defense it is alleged that the defendant performed legal services for the plaintiff and one Schneider; that there was an unpaid balance in the sum of $662.25 due from Schneider to the defendant and that "the plaintiff orally agreed to credit the unpaid balance of said bill to the principal due on said mortgage note" . . . . and that the plaintiff has failed to credit the same on said mortgage note.

These services were rendered in connection with an immigration case of one Marshak. The plaintiff had no financial

interest in this matter. The only interest which the plaintiff did have in this matter was to refer the case to the defendant and, thereafter, to assist the defendant by interviews with and letters to prominent officials.

On June 29, 1931, the defendant submitted a memorandum to the plaintiff in reference to the defendant's services and fees in the Schneider-Marshak matter.

That memorandum concludes with the message "I have not heard from Mr. Schneider except for one telephone call since the immigrants, Marshak and family, arrived in New York. Would it be advisable for me to submit copies of this statement to Alexander Marshak, or his family?"

(Defendant's Exhibit 14.)

The statement which accompanied the memorandum (Exhibit 14) was dated June 10, 1931.

Under the item "Credits" appear the items:

1930
October 22   By check of Sunrise Merrick
                     Trading Company              $250.00
1931
February 13  By check of A. B. Schneider    $100.00
March 23    By check of A. B. Schneider    $150.00
                                                            _____
           Total  credits                        $500.00

The statement also contains an item "Total expenses $162.25" and another item:

Fee for services                           $1500.00

Examination under a reasonably powerful magnifying glass discloses that the fee for services was originally entered at $1,000.00 and not $1500.00 and that there was an erasure and alteration of the $1,000.00 figure to make it read $1500.00.

Exhibit 49 "Daily Reminder" is a memorandum book introduced by the defendant as an exhibit.

At page 79 of Exhibit 49 under date of March 20, 1931, a memorandum appears in the admitted handwriting of the defendant as follows:

"Sykes phoned me and came to office. It was agreed

that in addition to the two payments of $250.00 and $150.00 heretofore received Schneider would pay $150.00 now and an additional $500.00 later. O. K."

Upon all of the evidence it appears that the only interest of the plaintiff in the Schneider-Marshak matter was to assist the defendant by first sending the business to the defendant and later assisting the defendant in every way possible and that the defendant collected everything possible from Schneider and finally endeavored to collect an additional sum from the plaintiff.

There was no original liability upon the part of the plaintiff to pay any sum in connection with this matter nor was there any subsequent promise to do so.

The allegations of Paragraph 3 of the Third Defense have no foundation in fact and are found to be untrue.

In Paragraph 4 of the Third Defense, as amended, it is alleged, substantially, that the plaintiff orally agreed to credit the defendant in the sum of $750.00 for services rendered to the plaintiff and one Adrianson.

Services were rendered by the defendant to the plaintiff in the Adrianson matter.

The reasonable value of these services was not in excess of $150.00.

The charge of $750.00 is grossly excessive.

Paragraph 4 of the Third Defense is found untrue as to the charge of $750.00 and true as to the sum of $150.00.

The Fourth Defense alleges, substantially, that the plaintiff and the defendant agreed "orally" that the defendant would render legal services to the plaintiff "and that when the defendant had reduced the principal sum of said mortgage to $10,000.00 the plaintiff would then release and discharge said mortgage . . . and that if the reasonable value of the defendant's services . . . exceeded the sum of $10,000.00, the plaintiff agreed to pay such excess to the defendant."

This preposterous claim finds no support in the evidence.

As if this claim were not sufficient to overtax credulity it is followed by the allegation of Paragraph 5 of the same defense in which it is alleged, substantially, that "in addition to the

legal services which he was already rendering" that defendant would render services to the plaintiff "in assisting the plaintiff in obtaining an appointment as trustee of the Police Relief Fund of the Police Department of the City of New York" and in performing other services in this connection for which the "defendant would receive annually from the plaintiff the sum of $10,000.00

The evidence furnishes no basis for this claim.

It is found to be untrue.

The 6th and 7th paragraphs of the Fourth Defense allege, substantially, that the plaintiff and the defendant agreed that the defendant would obtain a $4,000.00 mortgage from the Home Loan Corporation and that the plaintiff would accept the proceeds of the $4,000.00 mortgage and release and discharge the mortgage now sued upon and that the plaintiff would also release and discharge the $1,000.00 mortgage upon property of the sister of the defendant.

This claim finds no support in the evidence and is found to be untrue.

The defendant has also pleaded a cross-complaint in which he seeks to recover of the plaintiff the sum of $20,517.75 for alleged services and disbursements rendered by the defendant to the plaintiff.

The statement upon which this claim is based is Exhibit 1. It covers twenty-four closely typewritten pages and includes 206 items.

Upon a careful study of the evidence and the exhibits it is evident that in May, 1930, the practice and finances of the defendant were at a low ebb.

It also appears that at that time, and subsequently, the plaintiff and the defendant had many conversations and during the course of these conversations and interviews the defendant became acquainted with a great deal of the plaintiff's private business and also with the plaintiff's family affairs; that within about four years from May, 1930, the plaintiff sent clients to the defendant who were never before known to the defendant and whom he would not have met but for the plaintiff and that, from these clients, the defendant received nearly $12,000.00 for fees and disbursements.

Apparently the plaintiff then felt that in view of his kind-nesses to the defendant he might reasonably expect certain services would be rendered to the plaintiff by the defendant without charge.

There is no direct evidence of such implied agreement but the whole evidence justifies such an inference.

The whole record, including careful observation of the parties not only while testifying but in and about the Court room, would seem to reasonably warrant the inference that the defendant made the most of his opportunities and received and accepted the fees from clients sent to him by the plaintiff and that the defendant then conceived the plan to so manipu-late his relations with the plaintiff that ultimately he would be able to avoid payment of the amount ultimately due on the plaintiff's mortgage and make a substantial profit for himself through his relations with the plaintiff.

After exhausting every expedient for delay finally, when foreclosure proceedings were instituted by the plaintiff, the defendant then conjured up the items set out in his cross-complaint.

For some time past the plaintiff has been seriously ill and the defendant seems to have been obviously secure in the belief that the plaintiff's physical condition would not permit the trial of the issues and that the plaintiff would be loath to face an exposure of certain family matters respecting which no personal blame could be attached to the plaintiff.

Many of the 206 items contained in the defendant's cross-complaint are designed to extort money from the plaintiff with no semblance of justification; others are based upon half-truths —a few, while not morally justified, have a quasi legal basis.

As to the reasonableness of the fees claimed it is sufficient to say that a comparison of the items charged against the plaintiff, with other items previously charged in the defend-ant's own hand against clients with whom the defendant for-merly did business, indicate that the defendant attempted to value the services allegedly rendered to the plaintiff out of all proportion to the charge made against other clients.

It is also significant that, from the time the plaintiff and the defendant first met in May, 1930, the defendant's books show

practically no other outstanding accounts against other clients of the defendant.

The second item of the defendant's cross-complaint is a fair example of defendant's attempt to invent charges against the plaintiff which have no foundation in fact.

This item reads as follows:

"Consultation regarding the obligations of Edward Sykes to reimburse Henry K. McHarg, Sr., in the sum of upwards of $30,000.00 which McHarg claimed Charles Sykes, brother of Edward Sykes, had embezzled or stolen either in the form of money or negotiable securities . . . . 5 hrs. $125.00."

As to this item it appears on Exhibit 87—plaintiff's check book, that by check number 397, dated March 27, 1929, the plaintiff paid Henry McHarg $6500.00 on this very account and that on July 5, 1929, the plaintiff paid, by his check number 426, and also the delivery of some stock, "in settlement of all claims on account of Charles Sykes."

Charles Sykes was plaintiff's brother.

It therefore definitely appears that, since plaintiff and the defendant first began to deal in May, 1930, that in July of the preceding year plaintiff had compensated McHarg in full for the irregularities of the plaintiff's brother, Charles Sykes, while in the employ of Henry McHarg, and that on May 23, 1930, there was no reason or basis for the consultation alleged in the second item of the defendant's bill of particulars as contained in his cross-complaint and for which alleged services a claim of $125.00 is made at this time by the defendant against the plaintiff.

In view of the conduct of the defendant upon the witness stand and of his general line of testimony, it seems reasonable to infer that this baseless item was conjured up by the defendant in the belief that it would be embarrassing to the plaintiff to face such evidence in open Court.

The testimony respecting this item was consistent with the whole course of the conduct of the defendant respecting the private affairs of the plaintiff.

The validity of this item is on a par with the Third Count

of the cross-complaint in which the defendant seeks to recover for services at the rate of $10,000.00 per annum in connection with services allegedly rendered to the plaintiff in connection with Police Relief Fund matters.

The only possible foundation for this claim seems to be that the plaintiff attended a meeting of Police Chiefs at Rochester, New York, and, while there, consistent with plaintiff's usual kindness to the defendant, the plaintiff recommended the defendant to the association as its attorney on account of the knowledge which the defendant had obtained along these lines while the defendant was an assistant corporation counsel of the City of New York.

Although the association did not see fit to employ the defendant, subsequently, the defendant rendered a spurious bill to the Nassau association for $15,000.00 for alleged services which the association repudiated and refused to pay.

Yet the defendant now seeks to recover $10,000.00 from the plaintiff for such alleged services.

Again—on the question of the reasonableness of the fees attempted to be charged by the defendant to the plaintiff.

The evidence shows that the plaintiff, when a boy, entered the employ of Henry McHarg.

After the meeting of May, 1930, with the plaintiff, the defendant then, through the plaintiff, met the son of Henry McHarg.

Subsequently the defendant brought an action against McHarg, Sr., in favor of McHarg, Jr.

The plaintiff made every effort to have this suit dismissed but without success.

While the suit was pending McHarg, Sr., made an effort to settle the matter.

In the negotiations between the respective counsel respecting a settlement of the litigation between McHarg, Jr., and McHarg, Sr., the matter of defendant's charges for his services was discussed.

On Exhibit 51, under date of December 7, 1933, in defendant's own hand, it appears in the defendant's memorandum

book that the fee which he then demanded for his services and as part of the settlement was $50,000.00.

The evidence in this case discloses that upon the final settlement of the litigation between McHarg, Sr., and McHarg, Jr., that the fee received by the defendant instead of $50,000.00 was $5,000.00.

A further illustration of the unreasonableness of the defendant's charges, and the inaccuracy of the items set up by him against the plaintiff, appears in connection with the claim made by the defendant against the plaintiff for services rendered in connection with the matter of Helen Menzie.

Defendant's Exhibit 1 is a statement of all of the charges made by the defendant against the plaintiff under his cross-complaint.

Under the item for services alleged to have been rendered to the plaintiff by the defendant in connection with the Helen Menzie matter the following appears:

| Page 15 | 6 items totaling | $182.00 |
| Page 16 | 7 items totaling | $227.00 |
| Page 21 | 2 items | $ 50.00 |
| | | $459.00 |

Exhibit G is the defendant's ledger, ostensibly, containing entries of the items of the defendant's services.

On the 9th page of that ledger (Exhibit G) appear items of services, ostensibly, rendered in the Helen Menzie matter.

This ledger was supposed to have been kept in chronological order.

This ledger contains eight items of charge.

The last entry on Page 9 of Exhibit G—defendant's ledger—is "my fee to date $100.00."

This is written in in longhand, admittedly by the defendant.

On pages 15, 16 and 21 of Exhibit 1 of the defendant's bill of particulars there appear 15 items and the total of these items is $459.00—a difference of $359.00 between the defendant's ledger and his bill of particulars.

The last date in the ledger is May 23, 1932.

The bill of particulars was filed January 11, 1935.

On the ledger there is nothing to indicate that the charge for services in the Menzie matter was to be made against anyone except the person to whom the services were rendered —Helen Menzie.

In the bill of particulars these sums are charged to the plaintiff.

The only reasonable inference upon the whole evidence is that the defendant designed to deceive the Court into finding that the plaintiff was indebted to the defendant in the sum of $459.00 for services which the defendant agreed to render —not to the plaintiff nor for his benefit—but to Helen Menzie for the sum of $100.00.

The evidence also discloses that the defendant is now attempting to charge the plaintiff for advancing the defendant's own political prospects in an endeavor, upon the part of the defendant, to ingratiate himself with persons of political importance and also for charges in connection with the plaintiff's alleged desire to become a candidate for Congress.

For these alleged services the defendant has attempted to charge the plaintiff for eighty-five and a half hours services in the sum of $1977.53.

The plaintiff, a Republican, did not wish to accept the nomination as a candidate for Congress on the Democratic ticket.

The defendant so artfully contrived to have the plaintiff sign letters which the defendant had composed that the nomination of the plaintiff was practically assured until the plaintiff positively declined to accept.

In this connection the defendant sought to ingratiate himself with candidate Smith and the defendant wrote various letters ostensibly but not in reality, at the request of the plaintiff, endorsing the Smith candidacy.

For his alleged services in connection with the Smith candidacy the defendant now seeks to recover of the plaintiff for nine hours service charged at $225.00.

These claims on the part of the defendant against the plaintiff have no foundation in fact and are found to be untrue.

One Edward Steaken, a former policeman, sought the advice of the plaintiff in an attempt to be restored to his position as a lieutenant of police.

The plaintiff did not know Steaken but, in line with his characteristic desire to aid policemen, he referred Steaken to the defendant.

The plaintiff cooperated with the defendant in attempting to secure the re-instatement of Steaken to the police force.

After spending considerable time in an apparently hopeless effort to secure the restoration of Steaken the defendant, in his own handwriting, made the following entry in his diary— Exhibit 51—under date of September 1, 1933:

"Steaken came in Said he could not raise Cost of Printing his case at App. Div. . . . ."

A careful examination of this entry clearly indicates that the original entry ended with the words "App. Div." and that subsequently the defendant, in his own hand, but in a different style of writing and also in a different kind of ink and in a heavier hand added the words "and had to rely on E. S. (apparently referring to the plaintiff, Edward Sykes) but would give him the first money he received for the relief and assistance.

56 hours work                                    $1,000.00."

The first entry indicates that the defendant looked to Steaken, his client, for compensation.

The additional and substituted entry and charge of $1,000.00 would indicate that the defendant, in all probability, made the additional entry solely for the purposes of this trial and in an attempt to make it appear that the defendant then looked to the plaintiff for compensation in the Steaken matter as he now claims to do.

Defendant's Exhibit 29 consists of 25 sheets of paper claimed by the defendant to have been entered in due course in the day and time of its various purported entries.

Upon all of the evidence it is found that the entries upon Exhibit 29 were not made in the regular course of business but were made up especially as evidence for the purposes of this trial.

None of the entries appearing in Exhibit 29 are entitled to any credibility.

Upon all of the evidence one fact seems to be clear, that is that the defendant readily accepted and retained all of the fees which he received from clients sent to him by the plaintiff but that when payments in some cases were not made by some of the clients the defendant now attempts to hold the plaintiff responsible.

The two positions are inconsistent.

The defendant, while the recipient of nearly $12,000.00 which came to him through the recommendations of the plaintiff, did render some services to the plaintiff.

From the evidence it appears that the defendant collected $130.00 from the tenant who formerly occupied the premises which the defendant subsequently bought and is now occupying.

It does not appear that the defendant accounted to the plaintiff for the $130.00 so received but no foundation for an adjudication of this phase of the matter is to be found in the pleadings.

There would seem to be no moral obligation upon the part of the plaintiff to pay the defendant for any of the services which were rendered to him but there seems to be a quasi implication of legal liability.

The items and amounts within this category are as follows:

| | | |
|---|---|---|
| 1. | Examination of records of New York Supreme Court respecting various actions brought by others than Henry McHarg against Charles Sykes, including stenographic disbursement | $100.00 |
| 2. | Services in connection with the drafting of the plaintiff's change in his will | $350.00 |
| 3. | Services in connection with King Security Corporation | $150.00 |
| 4. | Long Island Water Company matter | $ 50.00 |
| 5. | Adrianson mortgage matter | $150.00 |
| | Total | $800.00 |

The figures submitted on behalf of the defendant as the amount due to the plaintiff from the defendant on the mortgage as of December 31, 1935, are found to be correct and the amount due is therefore adjudged to be $15,005.20.

Subtracting from this amount due from the plaintiff to the defendant for services, $800.00, the balance remaining due to the plaintiff from the defendant upon the mortgage note is $14,205.20 as of December 31, 1935, and judgment may be entered in favor of the plaintiff to recover that sum of the defendant, with interest from December 31, 1935. The law day for the defendant on redemption upon the mortgage is fixed as of the first Tuesday of October, 1936.

Judgment may be entered accordingly.